**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 03-6462**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

IN RE: )
)
THE SOCIETY OF LLOYD'S, )
)
    Plaintiff-Appellee, ) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
v. ) MIDDLE DISTRICT OF TENNESSEE
)
BEN P. SHIELDS, MARGARET WOOD )
JONES, MARGARET W. NICHOL, and )
KATHERINE HARWOOD GOOCH, )
)
    Defendants-Appellants. )
)
)
)
)

Before: DAUGHTREY and SUTTON, Circuit Judges; FORESTER, District Judge.[*]

SUTTON, Circuit Judge. Members of the Society of Lloyd's challenge a district-court judgment against them for failure to pay their contractual share of premiums on a reinsurance policy. For the reasons that follow, we affirm.

I.

In *Shell v. Sturge*, 55 F.3d 1227, 1228 (6th Cir. 1995), we described the relationship between the Lloyd's insurance marketplace and its members (known as "Names") in this way:

---

[*]The Honorable Karl S. Forester, Chief Judge of the Eastern District of Kentucky, sitting by designation.

> The Society of Lloyd's, or Lloyd's of London, ("Lloyd's") is not an insurance company, but rather is an insurance marketplace in which individual Underwriting Members, or Names, join together in syndicates to underwrite a particular type of business. The Corporation of Lloyd's . . . , which was created by an Act of Parliament, regulates the Lloyd's insurance market. The Corporation itself does not underwrite any insurance, but provides facilities and services to assist underwriters. The Corporation is managed by the Council of Lloyd's (Council) which controls the admission and discipline of Names, sets the Names' reserve requirements and establishes standards for Lloyd's policies.

*Id.* at 1228.

Under a "General Undertaking" agreement with Lloyd's, the Names agreed that all pertinent disputes would be governed by English law and heard in English courts. JA 34. The agreement also provided that the Names "shall become a party to, and perform and observe all the terms and provisions of, any agreements or other instruments as may be prescribed and notified to the [Name] *or his underwriting agent* by or under the authority of the Council." D. Ct. Op. at 8; JA 34 (emphasis added).

In the late 1980s and early 1990s, the Names suffered large underwriting losses. D. Ct. Op. at 2. In an effort to avoid non-payment to policy holders, Lloyd's reinsured all of the Names' outstanding obligations through a reinsurance contract with the Equitas company. Lloyd's calculated and charged each Name the cost of reinsurance, which the parties refer to as the "Equitas Premium." The contract contained two pertinent clauses: (1) a "pay now, sue later" clause, which said that any causes of action against Lloyd's must be brought separately, not as set-offs or

counterclaims in Lloyds' actions for reimbursement, and (2) a "conclusive evidence" clause, which prohibited the Names from challenging Lloyds' computations of their liability.

In 1998, Lloyd's obtained judgments in an English court against the four Names in this case—Ben Shields, Katherine Harwood Gooch, Margaret Wood Jones and Margaret Nichol—for failure to pay their Equitas Premiums. On January 10, 2003, Lloyd's filed this action in the United States District Court for the Middle District of Tennessee, seeking to enforce the English judgment against the Names.

The Names asserted two defenses. First, they argued that Lloyd's came to the Eastern District of Tennessee with unclean hands, having defrauded this court in *Shell* by asserting that certain claims could be brought against Lloyd's in English court when in fact they could not be heard there. Because *Shell* was binding precedent on them, the Names continued, they were affected by the fraud in that they could no longer argue in this circuit that similar choice-of-law and choice-of-forum clauses were unenforceable. JA 1250–53. Second, the Names argued that the district court should not enforce the English judgment because it was contrary to Tennessee public policy, most significantly because it prevented them from bringing certain claims and defenses as a set-off or counterclaim in Lloyds' action against them.

On October 1, 2003, the district court granted Lloyds' motion for summary judgment. To start, the court denied the Names' unclean-hands defense. "The principle indicated by this maxim applies only to the conduct of the party in respect to the particular transaction under consideration, for the court will not go outside of the case for the purpose of examining the conduct of the plaintiff

in other matters or questioning his general character for fair dealing." D. Ct. Op. at 7. Any possible fraud by Lloyd's in *Shell*, the court observed, would not entitle the Names to an unclean-hands defense in this action because the fraud would not "have an immediate relation to the equity [Lloyd's] seeks in this case. [The Names] do not allege that [Lloyd's] committed fraud or is guilty of other misconduct in the process of obtaining the specific judgments which it seeks to enforce herein." *Id.*

Next, because the proceeding in England was not contrary to Tennessee public policy, the court concluded that the judgment obtained there could indeed be enforced here. Rule 69(a) of the Federal Rules of Civil Procedure, the court noted, directs a district court to execute a judgment "in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought," which means the court will apply Tennessee's law of international comity. "Where the law of another jurisdiction is applicable, Tennessee will enforce the substantive rights which litigants have under the laws of the other jurisdiction if such rights are not contrary to the policy of Tennessee." D. Ct. Op. at 4 (citing *Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn. 1978) ("We would . . . deny comity to a foreign nation [judgment] if its lack of jurisdictional requirements equivalent to our own resulted in prejudice to any citizens of this State.")). More recently, the court added, Tennessee courts have indicated that they will recognize a foreign judgment through international comity if it is a "valid judgment rendered in a foreign nation after a fair trial in a contested proceeding." *Maberry v. Maberry*, No. M1999-01322-COA-R3-CV, 1999 WL 1072568, at *2 (Tenn. Ct. App. Nov. 30, 1999).

In this instance, the court ruled that the Names had failed to establish that the English proceedings violated Tennessee public policy in any way. Any complaints about the "pay now, sue later" and "conclusive evidence" clauses, the court pointed out, stemmed not from English law but from the Names' acceptance of a contract containing these requirements. And it was the contract again, not English law, that subjected the Names to their appointed agents' agreements. D. Ct. Op. at 8–9. As the court put it: "Defendant's argument concerning this contractual clause is an attack on the contracts, not an attack on the English Courts. This Court must determine whether the proceedings in the English Courts, which resulted in these judgments against Defendants, were fair, not whether the underlying contracts were fair." *Id*. at 9.

On appeal, the Names argue that the district court erred in rejecting these two defenses and in refusing to order further discovery regarding the alleged fraud in the *Shell* case. Having reviewed the parties' briefs, reviewed the record and entertained oral argument in this case, we affirm the district court's judgment for the reasons stated in its opinion—with one modest elaboration.

II.

The Names persist that the district court erred in denying their unclean-hands defense on the grounds that the Names were not parties in *Shell*. While the district court indeed mentioned this fact, it did not premise its rejection of the unclean-hands defense on party identity alone. The Names, the court added, "do not allege that [Lloyd's] committed fraud or is guilty of other misconduct in the process of obtaining the specific judgments which it seeks to enforce herein." D. Ct. Op. at 7.

Nor did the court err in concluding further that the fraud alleged here did not bear an immediate and necessary relation to the relief Lloyd's sought in this case.

"[Courts] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). In *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383 (1944), for example, the Court declined to apply the unclean-hands doctrine to a case in which a motor carrier sought to reclaim illegally seized liquor. The officials responsible for seizing the liquor invoked the maxim based on allegations that the motor carrier's possession of the liquor violated federal law. In rejecting this argument, the Court noted that the maxim "does not mean that courts must always permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law *in the transactions involved*." *Id*. at 387 (emphasis added).

This court likewise has required a nexus between the alleged misconduct and "the transactions involved":

> The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith *related to the matter at issue to the detriment of the other party*. The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff *relate directly to the transaction about which the plaintiff has made a complaint* . . . . Finally, the doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct.

*Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1383 (6th Cir. 1995) (emphasis added; internal citations and quotation marks omitted). *See also Dollar Systems, Inc. v. Avcar Leasing*

*Systems, Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) (cited in *Performance Unlimited* and holding that

a plaintiff's alleged failure to perform under a franchise agreement is not sufficiently related, at least

for unclean-hands purposes, to the plaintiff's action seeking to rescind the same franchise

agreement).

Tennessee courts follow a similar rule:

> [T]he acts complained of will not afford grounds for application of this maxim if not related to defendant or anything in which he was interested . . . . [E]quity will scrutinize his conduct with reference to the transaction *as it affects his adversary*, and if it is fraudulent, illegal or unconscionable he will be dismissed . . . . If the alleged wrongful conduct of the complainant appears not to have injured, damaged, or prejudiced the defendant, the maxim may not be successfully invoked . . . . The party to suit complaining of a wrong must have been injured thereby to justify the application of the principle of unclean hands to the case of his opponent . . . . "Clean hands" means a clean record with respect to the transaction with the defendant, and not with respect to any third person.

*Nolen v. Witherspoon*, 187 S.W.2d 14, 16 (Tenn. 1945) (emphasis in original; internal citations and

quotation marks omitted). Also,

> A may not rely upon this maxim as a defense because it appears that at some previous time B had obtained from a third party the funds or the thing in litigation by the prosecution of an unjust demand. This would take the court too far afield, involve a reopening of past and independent issues, and the bringing in of parties not before the court in the pending suit.

*Williams v. S. & W. Const. Co.*, 66 S.W.2d 992, 993 (Tenn. 1933) (denying unclean-hands defense

raised by employer when employee seemed to have already obtained compensation from another

employer for the same injury).

It is true, as the Names point out, that *Keystone Drilling* establishes that relief sought against one party may have an immediate and necessary relation to the alleged fraud committed in a prior action against a different party. In that case, Keystone committed fraud in bolstering the validity of a patent in an infringement case against Byers Machinery. *Keystone Drilling*, 290 U.S. at 243. The Court held that the unclean-hands defense was available in Keystone's subsequent infringement case, involving the same patent and related patents, against General Excavator. "Keystone used the decree of validity . . . obtained [in the Byers case] in support, if not indeed as the basis, of its applications . . . . [T]hat decree was given weight on the motions for preliminary injunctions [in the case against General Excavator]." *Id.* at 246.

A comparably direct relationship between the alleged fraud in *Shell* and Lloyds' actions in this case, however, does not exist. In *Keystone Drilling*, the fraudulent decree affected a directly relevant infringement defense available to the defendant: General Excavators could have asserted that the patents at issue were not valid and could not serve as the basis for the present infringement claim. Not so in this case. Even if we assume that Lloyd's fraudulently obtained the binding result in *Shell*—that the General Undertaking's choice-of-law and choice-of-forum clauses are enforceable—Lloyd's did not need to rely on *Shell* (a securities fraud case) to obtain the judgment it obtained in the English courts or the enforcement it seeks in the district court. That is, even if the Names somehow had established that the choice-of-law and choice-of-forum clauses were unenforceable, then had succeeded in moving Lloyd's claim against them to some other forum, the Names have not shown that any alternative forum would refuse to enforce the "pay now, sue later" and "conclusive evidence" clauses to which they had contractually committed themselves.

III.

For these reasons and the reasons stated in the district court's opinion, we affirm.